IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2021 Session

**STATE OF TENNESSEE v. JAVIER ALEXANDER RIVAS AND HAYDEN
S. FRYER**

**Appeal from the Criminal Court for Davidson County
No. 2016-B-661      Steve R. Dozier, Judge**

_____

**No. M2019-02241-CCA-R3-CD**

_____

Javier Alexander Rivas ("Defendant Rivas") and Hayden S. Fryer ("Defendant Fryer") (or collectively "the Defendants") were each convicted by a Davidson County jury for first degree felony murder, first degree premeditated murder, attempted aggravated burglary, reckless endangerment with a deadly weapon, burglary of an automobile, two counts of employing a firearm during the commission of a dangerous felony, and two counts of attempted first degree murder, for which the trial court sentenced both Defendant Rivas and Defendant Fryer to a total effective sentence of life plus fifty-two years. On appeal, Defendant Rivas argues that: (1) the trial court erred in denying his motion for severance of offenses; (2) the trial court erred in denying his motion to suppress his statements to police; (3) the evidence is insufficient to support his convictions; and (4) the trial court abused its discretion by ordering consecutive sentencing. Defendant Fryer challenges the sufficiency of the evidence as it relates to his convictions for first degree premeditated murder and attempted aggravated burglary. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Manuel B. Russ (on appeal) and Elaine Cuthbertson (at trial), Nashville, Tennessee, for the appellant, Javier Alexander Rivas.

Jay Umerley (on appeal) and Michael Shaw Cunningham (at trial), Nashville, Tennessee, for the appellant, Hayden Steven Fryer.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King and Kate Melby, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

In May 2016, the Davidson County Grand Jury indicted both Defendant Fryer and Defendant Rivas for the following offenses:[1]

| Count | Offense | Victim | Date |
|---|---|---|---|
| 1 | First Degree Felony Murder | Olympia Hobbs | 10/25/15 |
| 2 | First Degree Premeditated Murder | Olympia Hobbs | 10/25/15 |
| 3 | Attempted Aggravated Burglary | Olympia Hobbs | 10/25/15 |
| 4 | Employing a Firearm During the Commission of a Dangerous Felony | | 10/25/15 |
| 5 | Attempted First Degree Murder | Christopher Corbett | 10/24/15 |
| 6 | Attempted First Degree Murder | William Weaver | 10/24/15 |
| 7 | Reckless Endangerment with a Deadly Weapon | Jessica Blankenship | 10/24/15 |
| 8 | Burglary of a Motor Vehicle | Christopher Corbett | 10/24/15 |
| 9 | Employing a Firearm During the Commission of a Dangerous Felony | | 10/24/15 |

*Motion for Severance*

Following his indictment, Defendant Rivas filed a Motion for Severance, requesting that the trial court sever the offenses committed on October 24, 2015, from those

---

[1] Two additional co-defendants—Paige Elliott and Tanjanekia Elliott—were indicted with Defendant Fryer and Defendant Rivas.

committed on October 25, 2015.[2]  At a hearing on the motion,[3] Detective Darry Baltimore of the Metro-Nashville Police Department (MNPD) testified that he was the lead investigator into the shooting death of Olympia Hobbs, which occurred on Hopewood Court on October 25, 2015.  Detective Baltimore explained that, as part of his investigation, he obtained video surveillance footage that linked the shooting of Ms. Hobbs to another shooting that occurred on Lutie Street approximately two hours prior.  He stated that the two locations were in the same part of town, about four miles apart.  He said that the surveillance footage showed that Defendant Fryer and another man left Defendant Fryer's home at 6:53 p.m. on October 24.  Detective Baltimore said that he also had surveillance footage from a liquor store that showed co-defendants, Paige Elliott and Tanjanekia Elliott, getting out of a 2006 gold Lincoln Zephyr and entering the store at 7:20 p.m. on October 24.  He explained that the gold car was used by the four suspects in both sets of offenses and that the surveillance footage showed that Ms. Paige Elliott got out of the driver's seat and Ms. Tanjanekia Elliott exited the front passenger side of the vehicle.  He said that the investigation showed that Defendant Rivas sat behind Ms. Paige Elliott in the gold car and that Defendant Fryer sat behind Ms. Tanjanekia Elliott.  Detective Baltimore said that the shooting on Lutie Street occurred while the four co-defendants were "out boosting cars[.]"  He said that Ms. Tanjanekia Elliott was caught breaking into a car on Lutie Street by the car's owner, Christopher Corbett.  She ran back to the gold car, and then at least one of the Defendants fired shots at Mr. Corbett from the back seat of the gold car as it drove away.

Detective Baltimore testified that he later interviewed Ms. Tanjanekia Elliott about the shooting on Lutie Street.  She explained that, after the shooting, Ms. Paige Elliott said that she wanted to "[h]it a lick[,]" meaning that she wanted to commit a robbery.  Ms. Paige Elliott had driven the gold car to Ms. Hobbs' residence on Hopewood Court so that they could "case" the residence.  Ms. Tanjanekia Elliott explained that Ms. Paige Elliott had previously dated Ms. Hobbs' son, Darry Hobbs.  She said that Ms. Paige Elliott brought up the Hopewood Court residence as a potential place to "rob or burglarize" because Darry Hobbs sold drugs out of the residence.  Detective Baltimore testified that, during the time in between the shooting on Lutie Street and the shooting on Hopewood Court, an officer conducted a traffic stop on the gold car while it was occupied by the four suspects.

Detective Baltimore explained that there was evidence that the same weapons were involved in both shootings—a .45 caliber handgun and an AK-47.  Detective Baltimore

---

[2] Defendant Rivas's Motion for Severance also requested that the trial court sever his case from that of his co-defendants.  However, because Defendant Rivas does not challenge the trial court's denial of that part of the motion on appeal, we have limited our summary to the facts regarding the issue of severance of offenses.

[3] By the time of the hearing, Ms. Paige Elliott's case had been severed from that of Defendant Rivas, Defendant Fryer, and Ms. Tanjanekia Elliott.

said that both Ms. Paige Elliott and Ms. Tanjanekia Elliott told him that Defendant Fryer had the AK-47 and that Defendant Rivas had the .45 caliber handgun. Defendant Rivas, however, provided Detective Baltimore with a statement in which he said that Defendant Fryer had the .45 caliber handgun. Detective Baltimore testified:

> [Defendant] Rivas in his statement . . . told me that they went through that area and they were boosting cars. [Defendant] Rivas told me that nobody fired from the car, from their car. Somebody fired at them is what they told me. He did tell me that the .45-caliber [handgun] he did not have it. He said that [Defendant] Fryer had the .45.

Detective Baltimore said that Defendant Rivas admitted to "casing" the residence on Hopewood Court and that he admitted that Ms. Paige Elliott dropped off Ms. Tanjanekia Elliott before the homicide of Ms. Hobbs took place. Detective Baltimore continued:

> [Defendant Rivas] admitted to going to the house, backed in, walked up to the house. He . . . kn[ew] that [Defendant Fryer] knocked on the door, but he d[id]n't remember whether Ms. Hobbs opened the door or not. The shots were fired [at Ms. Hobbs] and [Defendant Rivas] said that [Defendant Fryer] told him after the shooting that [Defendant Fryer] was on [Xanax and] that's why the shooting took place.

Defendant Rivas told Detective Baltimore that, after the shooting of Ms. Hobbs, he, Defendant Fryer, and Ms. Paige Elliott ran back to the gold car and drove off. He said that Ms. Paige Elliott dropped him and Defendant Fryer off at Defendant Fryer's home on Antioch Pike. Defendant Rivas denied having a gun that night; he said that Ms. Paige Elliott had a .38 and that Defendant Fryer had a .45 caliber handgun. Defendant Rivas admitted to Detective Baltimore that he had also been in the gold car during the shooting on Lutie Street, but he denied that anyone in the gold car shot at the victims on Lutie Street.

Detective Baltimore said that Ms. Tanjanekia Elliott placed Defendant Rivas in the gold car when they were attempting to burglarize vehicles on Lutie Street. Detective Baltimore agreed, however, that she was unable to pick out Defendant Rivas in a photographic lineup and that she only described him as a "Hispanic male."

Detective Baltimore said that a portion of the video surveillance footage that he gathered from Ms. Hobbs' neighbor's home showed Defendant Rivas with a gun in his hand. Detective Baltimore explained:

> [Y]ou can see males and a female get out of the car. [Ms.] Paige [Elliott] g[o]t out of the driver side, look[ed] like [Defendant Fryer] got out of the

passenger side of the car, and [Defendant] Rivas g[o]t out of the rear passenger and then [went] up to the house. . . . [T]hey go out of camera view and you can see them run back and you can see the two males' arms go up as if they are shooting. And [Ms. Paige Elliott] gets in the car and it looks like she is about to pull off to leave one of them but stopped.

At the close of proof, counsel for Defendant Rivas argued:

The Lutie Street [offenses were in] a completely different area, completely different victims, different time, different day. That crime was completed. They dropped [Ms. Tanjanekia Elliott] off and then -- so everything was completed there. Then they went to [Hopewood Court] and that incident began later on that night, farther away.

They were driving all over Nashville, driving people, dropping them off. Going to liquor stores. I would say that they are two completely separate incidents. And if we enter evidence of [the offenses on] Lutie Street that will definitely prejudice the jury against everything that has -- there is no way [Defendant] Rivas could get a fair trial.

The prosecutor responded:

And getting back to the severance motion, insofar as the offenses, I think probably the big part of this motion is the Lutie Street versus the Hopewood [Court], I wouldn't deny that. And I would submit that the easy prong to show for the State would be evidence of one -- would be admissible at the trial of another and that would go to several factors identity, motive, lack of mistake, lack of accident, intent, guilty knowledge and what the Court has is -- for lack of a better term, these folks are going out robbing and burglarizing this whole night.

This is all occurring in South Nashville. We all know that there is another apartment complex they went to and burglarized vehicles.

. . . .

They were going from one place to the next trying to burglarize vehicles. Trying to burglarize and/or rob and/or kill people. And so this is all one continuous action that is going on by these individuals. So we would submit that it was part of a common scheme or plan as well. And it would

be important . . . to get into this proof before 2:00 a.m. at Hopewood [Court] because it's going to be incredibly relevant.

Identification, I assume is going to be a potential defense. Wh[ere] these people were going that night, who was in the vehicle and we have nothing to suggest that anybody other than these four individuals were in the car before Ms. Tanjanekia Elliott was dropped off and then afterwards that the three individuals were there. And the evidence from the Lutie Street shooting would play into that.

Who -- what was the car [t]hat was used, who was the driver of the car, where was the person that fired the shots at the victims of Lutie Street situated in the car? That person was in the back seat which is exactly consistent with where [Defendant] Rivas and [Defendant] Fryer were during the evening before . . . [Ms.] Tanjanekia Elliott was dropped off.

The trial court took the Motion for Severance under advisement and then entered a written order denying the motion.[4] In the order, the trial court stated:

Here, because the charges against [] Defendant [Rivas] arose from different acts, the offenses must be part of the "same criminal episode" in order for the offenses to be mandatorily joined. Proof at the severance hearing and from [Ms.] Tanjanekia Elliot interviews showed the co[-]defendants planned to steal cars on the aforementioned dates. Additionally, the alleged incidents on Hopewood Court and Lutie Street occurred four (4) miles apart and within two (2) hours of each other. Based upon the above, the Court finds Counts one (1) through four (4) and Counts five (5) through nine (9) should be mandatorily joined pursuant to Tenn. R. Crim. P. 8(a).

Further, the court determined that a severance was not appropriate "to promote a fair determination of the defendant's guilt or innocence" pursuant to Tennessee Rule of Criminal Procedure 14(b)(2)(A). The trial court found that, even if the counts could not be mandatorily joined, they could be permissively joined under Tennessee Rule of Criminal Procedure 8(b). The court reasoned:

Here, the two incidents occurred approximately two (2) hours from one another and four (4) miles apart. Additionally, the four co[-]defendants created a premeditated plan to perform robberies on the aforementioned

---

[4] The State eventually filed a Motion to Sever Defendant, requesting that the trial court sever Ms. Tanjanekia Elliott's case from that of the Defendants, which the court granted.

dates. The proof from the State also indicated that the [D]efendants were unsuccessful in the Lutie Street robbery thereby leading to their robbery plans on Hopewood Court. Based upon the above the Court finds the two (2) incidents were part of a common scheme or plan.

The second determination of Tenn. R. Crim P. 14(b)(1) is whether evidence of one incident is admissible in the trial of the other. The Court finds each incident would be relevant and admissible in a trial of the other to show motive, intent, and identity of the defendant.

Therefore, even if the incidents could not be mandatorily joined, the incidents could be permissively joined.

### Motion to Suppress

Prior to trial, Defendant Rivas also filed a Motion to Suppress, requesting that the trial court suppress his statements to detectives, as well as any subsequently obtained evidence "because it was unlawfully secured in violation of the Fifth Amendment to the United States Constitution." At a hearing, Raphaela Rivas-Montoya testified that Defendant Rivas was her son. She said that she was at her home with Defendant Rivas and her daughter on March 1, 2016, when two detectives came to her home. She said that they were wearing badges and that their guns were "clearly visible." Ms. Rivas-Montoya testified that, when the detectives said that they needed to speak to Defendant Rivas, she did not feel like she or Defendant Rivas could leave the home. She stated that, during the subsequent conversation between Defendant Rivas and the detectives, she thought that they needed an attorney because Defendant Rivas was being "pressured to speak" by the detectives. She said that Defendant Rivas expressed that he wanted an attorney but that the detectives did not stop questioning him. Regarding Defendant Rivas's demeanor during the interview, Ms. Rivas-Montoya said that he seemed "scared," "hesitant," and "pressured." During cross-examination, she said that the detectives came to her home during the daytime and knocked on the front door and that she let them inside. She agreed that the detectives did not yell at them and that she never asked the detectives to leave her home. She agreed that Defendant Rivas spoke fluent English, that he was not handcuffed during the interview, and that, when they were done with the interview, the detectives did not arrest Defendant Rivas. She said that Defendant Rivas was not under the influence of drugs or alcohol at the time of the interview. She acknowledged that Defendant Rivas had prior interactions with law enforcement when he was a juvenile.

Erika Rivas testified that she was Defendant Rivas's sister and that she was at her mother's home on Ezell Road when Defendant Rivas was interviewed by detectives on March 1, 2016. Ms. Rivas recalled that the detectives sat on a couch in the living room

while Defendant Rivas sat on another couch. She said that she and Ms. Rivas-Montoya were standing behind one of the couches towards the kitchen listening to the interview. She said that the two detectives had badges and guns. She stated that both Ms. Rivas-Montoya and Defendant Rivas asked for an attorney during the interview. She testified, "Well, my mother was the one that suggested . . . past a point of the questioning, that my brother would need a lawyer. And my brother agreed to it, like yeah, I do." She said that, when Defendant Rivas asked about an attorney, nothing happened. She said that Defendant Rivas seemed nervous and hesitant to speak to the detectives but that she did not feel like she could ask the detectives to leave.

On cross-examination, Ms. Rivas agreed that detectives provided Defendant Rivas with his *Miranda* rights and that they told Defendant Rivas that he did not have to speak to them. She agreed that the detectives did not threaten anyone, did not take out their handcuffs, and did not arrest anyone. She said that Defendant Rivas was not under the influence of drugs or alcohol at the time of the interview.

Detective Baltimore testified that, as part of his investigation into the death of Ms. Hobbs, he and another detective met with Defendant Rivas on March 1, 2016, at Ms. Rivas-Montoya's home. Regarding his initial interaction with Defendant Rivas, Detective Baltimore testified:

> Knocked on the door, [Ms. Rivas-Montoya] came to the door. I asked her was [Defendant Rivas] there, she told me yes. She invited me in. I walked in. We both s[a]t down. [Defendant Rivas] came out of the back . . . [a]nd I told him [why] I was there, I wanted to talk to him. Read him his rights and then we began to talk.

Detective Baltimore said that he did not place Defendant Rivas under arrest but that he read Defendant Rivas his *Miranda* rights because it was Detective Baltimore's habit before interviewing suspects. He said that he let Defendant Rivas know that Defendant Rivas did not have to talk to him. He said that Defendant Rivas indicated that he understood his rights and that Defendant Rivas never said that he did not want to talk to detectives. Detective Baltimore testified that Defendant Rivas did not appear to be under the influence of drugs or alcohol at the time of the interview. He said that he reviewed a waiver of rights form with Defendant Rivas, and Defendant Rivas signed the form. Detective Baltimore explained that he spoke to Defendant Rivas in the living room for less than thirty minutes and that, during the conversation, Defendant Rivas admitted to being involved in the shooting on Hopewood Court. Detective Baltimore recalled that, as the detectives were leaving the residence, Defendant Rivas asked if he was going to jail. Detective Baltimore told Defendant Rivas that he would need to speak to the prosecutor.

Detective Baltimore recalled:

> [W]e were getting ready to leave and then I remembered another incident, so I went back and knocked on the door and we went back in and talked about the other incident where they were up around Lutie Street and a shooting [had] taken place and I asked [Defendant Rivas] about and he gave me a statement about that. And we went out to the car, and we left and went back to the station.

Detective Baltimore explained that this second conversation with Defendant Rivas occurred within five minutes of the detectives' leaving the home. He said that, when they returned, Defendant Rivas allowed them back inside. Detective Baltimore testified that both conversations with Defendant Rivas were recorded. He said that he had listened to the recording before his testimony and that no additional conversation had taken place that was not on the audio recording.

On cross-examination, Detective Baltimore acknowledged that, during the interview, there was a discussion about whether Defendant Rivas needed an attorney and that Ms. Rivas-Montoya asked Detective Baltimore about Defendant Rivas "remain[ing] silent[.]" Detective Baltimore agreed that, in response, he told her that he was not going to "wait for any bureaucrats[.]"

At the conclusion of the hearing, the trial court listened to the audio recording of Detective Baltimore's interviews with Defendant Rivas. The trial court noted that there was nothing inaudible on the recording "in or around the only time that there was any reference to an attorney." The trial court then announced its ruling, as follows:

> But the Court does not find that [Defendant] Rivas was under arrest as contemplated by the constitutional requirements to advise him of his *Miranda* warnings after that occurs. I mean, the statement was in his own house. His relatives were present and monitored the discussions. He's left there at his house. The officers leave, do not at any point take him into custody and leave without him being arrested.
>
> So even th[]ough there wasn't the requirement for -- constitutionally for *Miranda* warnings, the detective gives them to [Defendant] Rivas anyway. [Defendant] Rivas at the time, according to the transcript and recording, was [nineteen years old], which is youthful, but [Ms. Rivas-Montoya's] indicated that he's had a number [of] occasions with contact with the police, even taken to juvenile court.

And there is nothing in the recording nor the transcript that indicates he didn't understand his *Miranda* [r]ights even though he didn't have to be read them, he was, and signed them and talked to the police. After that signing of the form and discussions . . . there is the statement from -- now it's clear from Ms. Erika Rivas the sister, that that's the mom making the statement, okay, why don't -- one second so right now he can be a silent and can -- and call up a lawyer, right? And the detective answers that, yes, that's right, that's fine. And then she replied: You going to explain to me and [Defendant Rivas] what happened? By now I understand you can be silent, you can hire -- that's her saying that there in front of her son, but in listening to the tape, and there is nothing on the transcript, I don't ever hear [Defendant] Rivas, as indicated by his mother here today, that he ever asked for an attorney. She mentioned an attorney, he never makes any statement about it and goes into, and like the detective said, it may be a reluctant statement, nobody enjoys, relishes, is 100 percent proud of and signs on to and strongly admits being involved in a murder.

. . . [T]he defendant has to make an unequivocal request for [counsel]. If they do, then the questioning ceases. But he never says anything, his mom mentions a lawyer. But it's not unequivocal in any way[,] the detective answers her question[,] and then [Defendant] Rivas proceeds on with his respon[se]. . . . So there is nothing here in this discussion on tape that comes anywhere close to inquiring at all about an attorney.

I mean, the officers -- I mean, the officer's demeanor on the recording is calm and answers all of these questions. I mean, yes, the officers -- officer says about contacting the DA, it may go different, sure. But there is nothing in that recording that overcomes [Defendant] Rivas' voluntary statement. Obviously the recorder would be closer to [Defendant] Rivas than [Ms. Rivas-Montoya], so I do not credit her statement that he wanted an attorney here today. The recording, in the Court's opinion, I think most people would agree would be more accurate than a 33-month memory.

So[,] I do not think that he was under arrest, never in custody, never evoked his right to be silent, gave a voluntary statement and voluntary -- voluntarily, even though not required, signed a *Miranda* waiver.

So[,] I will deny this particular motion.

*Trial*

- 10 -

Jessica Blankenship testified that, on the night of October 24, 2015, she and her boyfriend, Christopher Corbett, were at their house on Lutie Street. Ms. Blankenship explained, "That day we had had a birthday party for one of our children. We had some family and friends over. [Mr. Corbett] was still up with some of our friends. I was in bed because I had to work the next morning." Ms. Blankenship said that she and Mr. Corbett had parked their cars in the street to accommodate their guests' vehicles. She said that they had a white 2004 Chevy Trailblazer and "a big white box truck" that Mr. Corbett used for work. She recalled that she was in bed and that Mr. Corbett was in the living room with family watching television when they heard their dog barking at something outside. Ms. Blankenship then said she heard Mr. Corbett say that "there was someone outside[.]" Ms. Blankenship grabbed her gun, a 9mm handgun, and went outside with Mr. Corbett and their friend, William Weaver. Ms. Blankenship noticed a car parked in the street in front of their driveway, and she saw a woman breaking into their Trailblazer. Ms. Blankenship recalled that the woman had on a black hoodie; she said that the woman was "probably medium-sized, white-skinned" but that it was dark outside and that she could not see well. She observed a man, whom she described as possibly being Hispanic, breaking into Mr. Weaver's truck. The woman breaking into the Trailblazer told them to "go back inside" and immediately started walking back to the street in front of Ms. Blankenship's driveway. As the man and woman got into the car, Ms. Blankenship saw a window rolling down on the car and a white male with shoulder-length brown hair pointing a gun at them. She recalled that the white male had a red bandana covering part of his face. She described the car as a four-door sedan that was "a lighter color[.]" She said that there was a fourth person inside the car who was driving.

Ms. Blankenship testified that Mr. Corbett took her gun and told her to run. She said that, as soon as she turned to run, the people in the car began shooting at them. She said that she ran and crouched down behind a grill and that she was afraid she was going to die. Ms. Blankenship stated that the first bullet "went right past [Mr. Corbett's] head" and that, if not for his getting behind the box truck, he would have been killed.

Christopher Corbett testified that, on the night of October 24, 2015, he was at his house on Lutie Street, where he lived with Ms. Blankenship and their children. That evening, they had family and friends, including Mr. Weaver, over at their home. Mr. Corbett recalled that, at one point, his dog started barking, so he looked outside. He noticed someone inside his Trailblazer, and he went outside to confront the individual. Mr. Corbett recalled that there was a woman with a red bandana over her face coming out of the Trailblazer. She walked back to the front passenger side of a lighter-colored four-door car. Mr. Corbett stated that he also saw a man walking back to the car. Mr. Corbett testified that someone rolled down the back window of the car and then fired a gun at Mr. Corbett. Mr. Corbett testified, "And as soon as the shots were fired, I kind of took shelter, like over by a box truck and returned fire." Mr. Corbett said that the man shooting at him also wore

- 11 -

a red bandana and appeared to have his hair in braids. He said that he believed a fourth person was driving the car.

Mr. Corbett said that he was almost hit by bullets fired at him. He said that one bullet "went right past [his] skull" while he was standing in the middle of his driveway and that the bullet hit the windshield of a car parked behind him in the driveway. He explained that, when he got behind his box truck, the people in the car began shooting into the door of the box truck. He said that Ms. Blankenship was "[r]ight beside" him when the shooting began and that he told her to run. Mr. Corbett testified that he was standing at the front of his driveway towards the street when the shooting started and that the lighter-colored car was not far from where he was standing. He said that approximately fifteen shots were fired at him. He explained, "I believe, there was two guns shooting at me, but they were not outside of their vehicle. It came from -- the gunfire came from inside of their vehicle." Mr. Corbett said that a Bluetooth speaker was stolen from the Trailblazer and that Mr. Weaver's keys were stolen from Mr. Weaver's truck.

William Weaver testified that he was friends with Mr. Corbett and Ms. Blankenship and that he was at their residence on the night of October 24, 2015. He estimated that sometime around 9:30 or 10:00 p.m., the dog started barking. Mr. Corbett went to the window and saw that someone was inside Mr. Corbett's Trailblazer. Mr. Corbett went into the bedroom and told Ms. Blankenship, and then Mr. Corbett, Ms. Blankenship, and Mr. Weaver went outside. Once outside, Mr. Weaver saw a woman inside Mr. Corbett's Trailblazer. He testified that, as they walked down the driveway, the woman inside the Trailblazer got out and walked towards a lighter-colored four-door car. She told them, "[Y]ou might want to go back inside." Mr. Weaver then looked to his car and saw that the dash lights were on and that a man was walking from his car. Mr. Weaver said that it was dark outside and hard to see the suspects' faces. He said that, as the man and woman got inside the lighter-colored car, the back windows rolled down and someone began shooting at Mr. Weaver, Mr. Corbett, and Ms. Blankenship. He said that he believed there were four people inside the car and that it sounded like more than one gun was shooting at them. Mr. Weaver explained that one of the men in the back seat of the car wore a red bandana. Mr. Weaver recalled that, after the first shot, he immediately jumped behind Mr. Corbett's box truck and knelt down until the shooting stopped. He said that he feared for his life and thought that he could be killed. Mr. Weaver stated that he heard at least fifteen gunshots and that the suspects "took off" after the shooting stopped. Mr. Weaver testified that the suspects stole his keys from inside his truck.

MNPD Officer Justin Cregan testified that he worked with the police department as a crime scene investigator. He said that he responded to the scene of the shooting on Lutie Street, where he photographed the scene and collected evidence. He stated that he found two .45 caliber shell casings in the street. He found a "complete bullet" in the driver's door

pocket of the box truck, and he observed that the box truck had two projectile strikes on it from bullets. Mr. Corbett's Trailblazer also had a projectile strike on it. Officer Cregan collected a bullet fragment stuck in a white Honda, which was parked in the yard of Mr. Corbett's and Ms. Blankenship's house, and a bullet fragment underneath the box truck. He said that he also collected four 9mm shell casings, which were fired from Ms. Blankenship's 9mm handgun.

Tanjanekia Elliott testified that she was charged as a co-defendant in the case and that her charges were pending. She stated that she had not been promised anything in exchange for her testimony. She said that she was twenty-two years old and that her cousin, Ms. Paige Elliott, was twenty-three. Ms. Tanjanekia Elliott recalled that, on the evening of October 24, 2015, Ms. Paige Elliott picked her up at her home in Antioch around 7:00 p.m. to "hang out as usual." She said that Ms. Paige Elliot was driving a gold four-door sedan. She recalled that they went to Defendant Fryer's home and waited for Defendant Fryer and Defendant Rivas. She stated that both Defendant Fryer and Defendant Rivas got into Ms. Paige Elliott's car with guns "on their laps." She said that Defendant Fryer had a "modern"-looking "big gun" and that Defendant Rivas had a black handgun with a clip. She said that Ms. Paige Elliott drove the car the entire night and that she sat in the front passenger seat. Defendant Fryer sat in the back seat behind Ms. Tanjanekia Elliott, and Defendant Rivas sat behind Ms. Paige Elliott. Ms. Tanjanekia Elliott explained that, after picking up the Defendants, Ms. Paige Elliott drove the car to a liquor store. After leaving the store, they went to Apollo Apartments, where Defendant Fryer met with someone. She said that they were there about twenty minutes. She said that Defendant Fryer "was talking to a group of people and they made a transaction. He got back in the car and [they] left that area." Ms. Tanjanekia Elliott recalled that they then went to West Nashville to purchase marijuana, which they later smoked at a park.

Ms. Tanjanekia Elliott said that Ms. Paige Elliott next drove to Hopewood Court in Antioch and parked on the street. Regarding why they went to Hopewood Court, she testified that Ms. Paige Elliott "was scoping the scene . . . seeing like who all was around and just like scoping it out." She said that Ms. Paige Elliott's ex-boyfriend lived on Hopewood Court. She said that Ms. Paige Elliott wanted them to get out of the car but that she convinced Ms. Paige Elliott to leave the area. She testified, "[W]e were basically just driving around, like just driving random places and we ended up at this dead end and everyone was like, they were like everybody pick a car, everybody get out of the car and take -- get something out of a car." She said that Defendant Fryer repeatedly asked Ms. Paige Elliott "where the licks were[,]" meaning places to "rob." She explained that a "lick" was a "target." Ms. Tanjanekia Elliott stated that, after leaving Hopewood Court, they continued to ride around Antioch looking for "random cars." She admitted that she attempted to enter other cars but said that most of the other cars they tried to enter were locked or had alarms.

They eventually ended up on Lutie Street. Ms. Tanjanekia Elliott stated:

> Well, I got out of the car and I went to this truck and I opened the door. The door was unlocked and I grabbed like a Bluetooth [speaker] and like, head phones. And then I closed the door and as I was walking away from the car, the owner comes outside and he's like what are you doing in my car? And I was like nothing. You know, just go back in the house. And I got back in the car on the passenger side and I was like frantic a little. And I was telling my cousin go, the owner came outside, go. And as my cousin was pulling off, [Defendant Rivas] and [Defendant] Fryer both came out of the back window with their guns and they started shooting at the homeowner as we were pulling off.

She stated that the Defendants were leaning towards the back window on the driver's side and shooting out the window at the same time. She said that Defendant Fryer was shooting the big gun and that Defendant Rivas was firing the handgun. She said that Ms. Paige Elliott drove away quickly and that they eventually ended up on Nolensville Road, where they were pulled over by a police officer. She explained that the officer asked Ms. Paige Elliott "why was she driving so frantic" and that Ms. Paige Elliott said she "misplaced something and . . . was just looking for it." The officer looked at her identification and then told her they could go. Ms. Tanjanekia Elliott stated that she was scared and wanted to get out of the car, so she asked Ms. Paige Elliott to drop her off at a friend's house in Antioch around 10:30 p.m.

A few days later, Ms. Tanjanekia Elliott learned that there had been a shooting on Hopewood Court and that her cousin was alleged to have been involved. She said that she later spoke to detectives and admitted her involvement. She said that she did not know the Defendants and that she had never been around them before the night of October 24. She stated that she identified Defendant Fryer in a photographic lineup but was unable to identify Defendant Rivas in a lineup. She recalled telling the detective that Defendant Fryer wore "a university-style" True Religion jacket, and she identified a photograph of a similar jacket.

Ms. Paige Elliott testified that she was charged with multiple felony offenses in the same indictment as the Defendants and that her charges were pending. She said that she had no agreement with the State in exchange for her testimony. She stated that, on October 24, 2015, she lived on River Road Pike in Nashville and owned a gold-colored Lincoln Zephyr, which she described as a four-door sedan. She explained that she used to date Ms. Hobbs' son. She said that she had broken up with Darry Hobbs about four or five months prior to October 2015.

- 14 -

She recalled that, on the evening of October 24, 2015, she drove to Ms. Tanjanekia Elliott's home, where she picked up Ms. Tanjanekia Elliott and they smoked marijuana together. She stated that she had known Defendant Fryer for a few weeks prior to this night. She said that, when Defendant Fryer got into her car, he had a gun under his jacket. She described the gun as "bigger. It wasn't just a handgun[.]" She said that the gun Defendant Fryer had "looked like AK, but it was a lot smaller." She testified that she also saw Defendant Rivas with a black handgun. She said that she drove the gold car the entire night and that Ms. Tanjanekia Elliott, Defendant Fryer, and Defendant Rivas were passengers. She said that, once everyone was inside the car, they "rode around" and "smoked some weed[.]" They then decided to break into cars. She continued, "[A]t some point we had went to some apartments and were breaking into cars. And then at some point we came to Lutie Street. [Ms. Tanjanekia Elliott] broke into somebody's car and . . . the person's car that it was came out and approached everybody about it." She said that there was "some yelling" and then a shot was fired. She said that she was not sure who shot first. She said that she drove away but said that she could not recall if the Defendants fired their guns from her car. She agreed that the Defendants were hanging out of the window of the car and that the Defendants were pointing their guns at the people outside.

Ms. Paige Elliott testified that, after the shooting on Lutie Street, she was pulled over by police for "swerving" but that she was only given a warning. She said that they went to Hopewood Court twice that night because they wanted to rob "Ms. Hobbs' house." She claimed that Ms. Hobbs and her son, Darry Hobbs, sold drugs out of the residence. She said that, the first time they went to Hopewood Court, they "roll[ed] by, check[ing] it out, just look[ing] around." After she dropped off Ms. Tanjanekia Elliott at a friend's house, Ms. Paige Elliott and the Defendants went back to Hopewood Court. She said that no one was outside, so she backed the car up towards Ms. Hobbs' residence. She said that they were unsure if anyone was home but that the plan was "to go in there and get stuff." She said that Defendant Fryer got out first and that she and Defendant Rivas followed. She went to the side of the residence, and the Defendants knocked on the front door. She heard the door open and then close quickly. She stated that Defendant Rivas shot through the closed door with the handgun. They ran back to the car, and she drove away from the scene. She said that she dropped off the Defendants at Defendant Fryer's home and then went home. She stated that she did not know what happened to the guns used by the Defendants. She said that the Defendants took the guns with them when they got out of her car.

Ms. Paige Elliott stated that she had reviewed video surveillance footage collected by detectives. She identified surveillance footage of their first trip to Hopewood Court and explained that it depicted the group "kind of scoping everything out." The surveillance footage showed that she parked on Hopewood Court for about ten minutes before they left the area because there were too many people outside. She said that no one got out of her

car that time. She also identified video surveillance footage from a house next door to Ms. Hobbs' residence. She said that it depicted her parking on the street in front of Ms. Hobbs' residence the second time. She said that she and the Defendants sat in the car for a minute talking about what they were going to do. She claimed that she told the Defendants that she did not want to be involved and did not want to continue. She explained that the surveillance footage showed them walking up to Ms. Hobbs' residence; she said that she went to the side of the residence and that the Defendants went up on the front porch. Ms. Paige Elliott explained that the surveillance footage showed that she and the Defendants returned to her car moments later. She got in on the driver's side of the car, and they got in on the passenger side.

Ms. Paige Elliott said that she spoke to detectives and eventually admitted her involvement in the events from the night of October 24 and morning of October 25. She agreed that detectives seized her cell phone and found text messages on her phone to a friend named "Quise." She agreed that one text message from her to Quise mentioned that the robbery "went so wrong." She explained that no one was supposed to get shot or die and that the purpose of going to Ms. Hobbs' residence that morning was to take drugs and money from "[w]hat was there." She clarified that neither she nor the Defendants entered the residence.

On cross-examination, she acknowledged that she told someone named "Pokey" that she shot Ms. Hobbs "with a 45[.]" She agreed that Ms. Hobbs had not liked her dating Ms. Hobbs' son and that Ms. Hobbs had called her a "crack head." She agreed that she initially lied to detectives and told them that she let a friend borrow her car on the night of October 24. She said that she wore gloves that night because she was "going in . . . cars." She testified that she had expected to obtain money and drugs from Ms. Hobbs' home.

Erin Wilson, the records' coordinator for the Nashville Department of Emergency Communications, testified that the department received the 911 call made by Balou Hobbs at 1:59 a.m. on October 25, 2015, which was played as an exhibit.

MNPD Officer John Jeanbapriste testified that he responded to a 911 call regarding a shooting on Hopewood Court shortly after 1:59 a.m. on October 25, 2015. Officer Jeanbapriste explained that he was met at the front door by a young teenage boy, Balou Hobbs, who said that his mother had been shot. Officer Jeanbapriste observed bullet holes in the front door. Ms. Hobbs had been brought to a back room in the house, and she was lying on her back "with blood coming down her, out of her stomach." He asked Ms. Hobbs how many people did this, and she held up one finger. She said that the suspect wore a mask. Officer Jeanbapriste asked Ms. Hobbs several more questions, but she told him that she "[couldn't] talk right now[.]" Minutes later, Ms. Hobbs was transported to the hospital, and Officer Jeanbapriste took Mr. Balou Hobbs and his little sister out of the residence.

Officer Jeanbapriste helped to secure the crime scene and contacted the Department of Children's Services to attempt to get a family member to come to the scene.

Christina Dradt testified that, in October 2015, she worked in the MNPD crime scene identification unit. She responded to the crime scene on Hopewood Court in the early morning hours of October 25 and took photographs of the scene and evidence. Ms. Dradt explained that she made a diagram of the outside of the residence that showed four .45 caliber cartridge casings located on the front porch and one .45 caliber cartridge casing in the driveway about thirty feet from the residence. Ms. Dradt identified four places in the front door, called "strap marks," where bullets went through the door. She said that she was at Ms. Hobbs' residence for about four hours and that she did not see any drugs, contraband, firearms, or large amounts of cash in the home.

Sharon Tilley testified that, in October 2015, she worked for the MNPD as a crime scene investigator. She explained that she worked the scene of the Hopewood Court shooting on October 25. Ms. Tilley said that she took some photographs of the scene and of the residence next door because there were cameras mounted on the outside of the residence. She made a diagram of the interior of the residence, noting multiple strike marks in the walls of the living room. She observed a projectile in a wall inside Ms. Hobbs' residence and collected it. Ms. Tilley also found a projectile underneath the coffee table and another one in a rear bedroom. She explained that there were no cartridge casings located inside the residence.

Bridgett Chambers testified that she worked in the MNPD crime laboratory in the firearms unit as a firearm and tool mark examiner. She testified that she compared the two .45 caliber cartridge casings recovered from the scene on Lutie Street with the five .45 caliber cartridge casings found at the scene of the shooting on Hopewood Court and determined that all seven cartridge casings were fired from the same firearm.

MNPD Detective Chad Gish testified as an expert in digital forensic analysis. Detective Gish stated that Detective Baltimore contacted him regarding cell phones associated with Ms. Paige Elliott and Defendant Fryer that detectives recovered as part of the investigation. Detective Gish said that he extracted and analyzed the contents of Ms. Paige Elliott's and Defendant Fryer's cell phones. In Defendant Fryer's phone, he found Defendant Rivas' contact information. He also found multiple photographs on Defendant Fryer's cell phone, including a photograph of two men possibly holding weapons. Detective Gish explained that one of the men was "wearing red clothing" and "carrying what appears to be an AK-47[.]" Detective Gish testified that another photograph depicted "a male on the left holding an AK-47 rifle. And a male on the right, it appears to be [Defendant] Fryer, holding two pistols, dressed in red." He identified a third photograph depicting "what appeared to be a large caliber pistol" and a fourth photograph showing "a

bandanna, wrapped around what appears maybe to be an AK-47[.]" He identified another photograph from Defendant Fryer's phone, showing Defendant Fryer dressed in a red jacket with dark colored sleeves and holding an AK-47.

MNPD Detective Derry Baltimore testified that he was the lead detective in the investigation into the murder of Ms. Hobbs. He said that he responded to her residence on October 25, 2015. He said that the scene had been secured already and that Ms. Hobbs had been taken to the hospital. Later that morning, he learned of Ms. Paige Elliott's possible involvement and went to her home on River Road, where he observed her gold 2006 Lincoln Zephyr. Detective Baltimore explained that, during his first conversation with Ms. Paige Elliott, she initially indicated that she did not know anything about the shooting but then admitted that she was "in the car[.]" Detective Baltimore took her to the police station for an interview, during which she implicated herself in the murder of Ms. Hobbs. Detective Baltimore stated that he released her that evening so that he could attempt to corroborate her story.

Detective Baltimore testified that he interviewed Ms. Paige Elliott again on October 26. Detective Baltimore explained that she mentioned Ms. Tanjanekia Elliott for the first time during this interview. He said that he collected Ms. Paige Elliott's cell phone and provided it to Detective Gish, who performed an extraction on it. Detective Baltimore stated that, inside Ms. Paige Elliott's phone, he found a contact for someone identified as "Hayden." He noted that Ms. Paige Elliott had communicated by text with someone named "Quise" after she was questioned at the police station the first time. Detective Baltimore explained that Ms. Paige Elliott told Quise that she was in trouble and that Quise asked, "What are you talking about?" She then commented that "it went wrong" and that she was "so scared." Detective Baltimore said that the extraction report showed that Ms. Paige Elliott made a call to Defendant Fryer on October 24 at 5:26 p.m. and on October 25 at 3:30 p.m.

Detective Baltimore said that he interviewed Ms. Tanjanekia Elliott twice. During one of the interviews, he showed her a photograph of a True Religion jacket, and she identified it as looking like a jacket worn by Defendant Fryer on the night of the offenses. Detective Baltimore conducted two photographic lineups with Ms. Tanjanekia Elliott. She positively identified Defendant Fryer in one lineup but picked out someone other than Defendant Rivas in the second lineup. Detective Baltimore explained that he later obtained video surveillance footage from a liquor store on Antioch Pike, which corroborated Ms. Tanjanekia Elliott's and Ms. Paige Elliott's statements that they had gone to the store on the evening of October 24.

Detective Baltimore stated that he also obtained video surveillance footage from cameras at Defendant Fryer's home on Antioch Pike. Detective Baltimore said that the

surveillance footage from Defendant Fryer's home showed that Ms. Paige Elliott picked up the Defendants on October 24, shortly before 7:00 p.m. Detective Baltimore identified Defendant Fryer on the surveillance footage and noted that Defendant Fryer wore black jeans, a light-colored hoodie, and a red and black True Religion jacket. He said that Defendant's Fryer's hair was braided. He also identified Defendant Rivas on the surveillance footage. Detective Baltimore said that the surveillance footage showed that the Defendants returned to Defendant Fryer's home at 4:39 a.m. on October 25. The surveillance footage showed Defendant Fryer placing a handgun on the ground and then pulling what appeared to be an AK-47 out of his pants and placing it on the front porch. He said that the Defendants went back inside Defendant Fryer's home at 4:50 a.m. Detective Baltimore explained that they executed a search warrant on Defendant Fryer's home in November 2015, after Defendant Fryer's arrest, but that they were unable to recover the firearms used in the offenses.

Detective Baltimore testified that he attempted to locate Defendant Rivas for several months and eventually located Defendant Rivas at his mother's home on March 1, 2016. Detective Baltimore was allowed into the home where he spoke to Defendant Rivas about the offenses. Defendant Rivas initially denied being at the scene of the Hopewood Court shooting. After telling Defendant Rivas about the video surveillance footage, Defendant Rivas claimed that he was at the scene but that he remained in the car and did not see anything. When told that the surveillance footage showed the time immediately before, during, and after the shooting, Defendant Rivas acknowledged that he was in the car when Ms. Hobbs' residence was "cased" and that he was there at the time of the shooting. He said that he was smoking marijuana that night and admitted that the motive to go to Ms. Hobbs' residence was "for the purpose of committing a robbery[.]" Detective Baltimore asked Defendant Rivas about the guns they had that night, and Defendant Rivas said that they had an AK-47 and a .45 caliber handgun. Defendant Rivas admitted that he was there when they knocked on Ms. Hobbs' front door and that he had the AK-47, but he denied that he was the shooter. Detective Baltimore also confronted Defendant Rivas about the shooting on Lutie Street. Defendant Rivas admitted that he had been at the scene on Lutie Street and that they had been stealing items out of cars prior to the shooting. Defendant Rivas denied that he fired any shots on Lutie Street or on Hopewood Court. He said that they dropped off Ms. Tanjanekia Elliott after the shooting on Lutie Street.

On cross-examination, Detective Baltimore agreed that no shell casings were found in Ms. Paige Elliott's car and that they found no AK-47 shell casings at the scene of either shooting. He acknowledged that there was no prior connection between the Defendants and Ms. Hobbs and that Ms. Paige Elliott was the ex-girlfriend of Darry Hobbs. Detective Baltimore agreed that Ms. Hobbs was shot around 2:00 a.m. and that the video surveillance footage from Defendant Fryer's home showed that they did not get home until 4:39 a.m., despite that Defendant Fryer's home was only ten minutes away from Hopewood Court.

Detective Baltimore agreed that, during his interview, Defendant Rivas was "terrified" for his family's safety and wanted Detective Baltimore to guarantee their safety. Defendant Rivas said that he was scared to testify against Ms. Paige Elliott and said that Ms. Paige Elliott had a gun that night. Defendant Rivas stated that he was also concerned for his safety because of others in the car that night. Defendant Rivas said that Ms. Paige Elliott had a .38 on the night of the shootings but said that he was unsure if she shot the gun. Defendant Rivas told Detective Baltimore that Ms. Paige Elliott was at the side of Ms. Hobbs' residence at the time of the shooting.

Detective Baltimore agreed that, during his investigation, he met with James Shelton, who had a recording of Ms. Paige Elliott in which she admitted to shooting and killing Ms. Hobbs "with a .45[.]" During the conversation with Mr. Shelton, Ms. Paige Elliott claimed that she was alone at the time she shot Ms. Hobbs. Detective Baltimore agreed that Ms. Tanjanekia Elliott was hesitant to talk about Ms. Paige Elliott's involvement in the offenses but that she eventually admitted Ms. Paige Elliott was the one that brought up "hitting a lick[.]"

Deputy Chief Medical Examiner Dr. Thomas Deering testified that he performed the autopsy on Ms. Hobbs on the afternoon of October 25. During the autopsy, Dr. Deering found evidence of several gunshot wounds, and he "defined two gunshot wound paths." He said that one of the gunshot wounds was a "very significant wound," which started at the right side of Ms. Hobbs' chest. He explained that the bullet passed through the right lung, the liver, the pancreas, the intestine, and the stomach, and it exited on the left side of her abdomen. He stated that the second gunshot wound was "superficial" and traveled "sideways across the top of her buttock." Dr. Deering opined that the cause of Ms. Hobbs' death was a gunshot wound to the torso and that the manner of death was homicide. At the conclusion of this testimony, the State rested its case.

MNPD Officer Geoffrey Daugherty was called to testify by Defendant Fryer. Officer Daugherty stated that he responded to the shooting call on Lutie Street on October 24 and that he spoke to Mr. Corbett, Ms. Blankenship, and Mr. Weaver while at the scene. Officer Daugherty said that Mr. Corbett described the female attempting to break into his vehicle as "a light-skinned . . . black female[.]" Mr. Corbett said that there were two males and two females in the gold car and that he believed all four suspects were black. Mr. Corbett told Officer Daugherty that the suspect who pointed a gun out of the car window had on a red bandanna covering most of his face. Mr. Corbett said that one of the males was bald, and he did not describe any of the suspects as being a white male.

Following deliberations, the jury found the Defendants guilty as charged. The trial court merged the Defendants' convictions for first degree premediated murder into their

convictions for first degree felony murder. The court sentenced Defendant Rivas and Defendant Fryer to life for first degree felony murder.[5]

*Sentencing*

At a subsequent sentencing hearing, the State offered into evidence presentence reports for both Defendant Rivas and Defendant Fryer. Shabakan Lewis, Ms. Hobbs' cousin, testified that she was speaking on behalf of Ms. Hobbs' family. She said that Ms. Hobbs was thirty-three years old and had three children—aged five, thirteen, and twenty-one—at the time of her death and that Ms. Hobbs' mother lived with them at the residence on Hopewood Court. When asked how Ms. Hobbs' murder affected her and the family, Ms. Lewis stated, "A part of us is gone. I mean, she was the baby. We have struggled for the last, since 2015, to figure out what to do now, because it was always our job, the three of us, together, doing everything." Ms. Lewis testified that the family was "working very hard to try to heal [Ms. Hobbs'] five-year-old and thirteen-year-old [children.]" She explained that Ms. Hobbs had been a teacher and that her death also impacted "ninety other children under the age of five." Ms. Lewis asked, on behalf of the family, that the trial court sentence the Defendants to the maximum sentence allowed by law.

Jose Rivas, Defendant Rivas's older brother, testified that Defendant Rivas had a "good heart" and that Defendant Rivas cared deeply for his son and family. He stated that Defendant Rivas was not the "mastermind" behind the offenses, and he said that he believed Defendant Rivas was "coerced into [the] plan" that night. He asked that the trial court not impose consecutive sentences on Defendant Rivas.[6]

At the conclusion of the hearing, the trial court took the matter under advisement. In a written order, the trial court sentenced both Defendant Fryer and Defendant Rivas to a total effective sentence of life plus fifty-two years, as follows:

| Count | Offense | Sentence | Alignment |
|---|---|---|---|
| 1 | First Degree Felony Murder | Life | |
| 3 | Attempted Aggravated Burglary | 4 years at 30% | Concurrent with Count 1 |

---

[5] The trial court did not impose a sentence for the Defendants' convictions for first degree premediated murder.

[6] The State also presented testimony from several officers regarding Defendant Fryer's prior record. We have not included a summary of that testimony, however, because it does not relate to the issues raised on appeal.

| | | | |
|---|---|---|---|
| 4 | Employing a Firearm During the Commission of a Dangerous Felony | 6 years | Consecutive to Counts 1, 5, 6, and 9 |
| 5 | Attempted First Degree Murder | 20 years | Consecutive to Counts 1, 4, 6, and 9 |
| 6 | Attempted First Degree Murder | 20 years | Consecutive to Counts 1, 4, 5, and 9 |
| 7 | Reckless Endangerment with a Deadly Weapon | 2 years at 30% | Concurrent with Count 1 |
| 8 | Burglary of an automobile | 2 years at 30% | Concurrent with Count 1 |
| 9 | Employing a Firearm During the Commission of a Dangerous Felony | 6 years | Consecutive to Counts 1, 4, 5, and 6 |

Thereafter, both Defendant Fryer and Defendant Rivas filed a timely Motion for New Trial, which the trial court denied following a hearing. The Defendants timely filed separate notices of appeal, and this court subsequently entered an order consolidating the Defendants' appeals.

## II. Analysis

### A. Severance of Offenses

Defendant Rivas argues the trial court erred in denying his Motion for Severance of offenses. He contends that the trial court erroneously determined that the Lutie Street offenses were mandatorily joined with the Hopewood Court offenses pursuant to Tennessee Rule of Criminal Procedure 8(a) and that the offenses should not be severed pursuant to Tennessee Rule of Criminal Procedure 14(b)(2). Defendant Rivas argues that the two sets of offenses did not arise from the "same conduct" and did not occur during the "same criminal episode." He further asserts that the similarity between the conduct and the charges in each incident required severance. Defendant Rivas contends that the trial court also erroneously determined that, under the standards of permissive joinder in Tennessee Rule of Criminal Procedure 8(b) and the review process in Tennessee Rule of Criminal Procedure 14(b)(1), the two sets of offenses should not be severed. The State responds that the offenses were subject to mandatory joinder and that, if joinder was not mandatory, the offenses were subject to permissive joinder, the trial court did not abuse its discretion in denying severance, and any error was harmless. We agree with the State.

## 1. Mandatory Joinder

In denying the Motion for Severance, the trial court concluded that all of Defendant Rivas's charges were part of the same criminal episode and that, therefore, they were subject to mandatory joinder under Tennessee Rule of Criminal Procedure 8(a). The findings of fact made by a trial court on the mandatory joinder of offenses "are binding upon this court unless the evidence contained in the record preponderates against them." *State v. Baird*, 88 S.W.3d 617, 620 (Tenn. Crim. App. 2001) (citing *State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000)). "However, this court is not bound by the trial court's conclusions of law." *Id.* (citing *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998)). The application of the law to the facts is a question of law that this court reviews de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000).

Under Tennessee Rule of Criminal Procedure 8(a), "[t]wo or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or the offenses consolidated pursuant to Rule 13," if the offenses are "based on the same conduct or arise from the same criminal episode;" are "within the jurisdiction of a single court;" and are "known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s)." Tenn. R. Crim. P. 8(a)(1). "A defendant shall not be subject to separate trials for multiple offenses falling within Rule 8(a)(1) unless they are severed pursuant to Rule 14." Tenn. R. Crim. P. 8(a)(2). All three of the criteria listed in Rule 8(a)(1) must exist before multiple offenses are required to be joined. The record is clear that the offenses occurred within the jurisdiction of a single court and that all the offenses were known to the State at the time of the return of the indictment. Moreover, the parties agree that the offenses on Lutie Street and the offenses on Hopewood Court do not arise out of the same conduct. Thus, the issue for the court is whether the offenses arise from the same criminal episode.

For offenses to be considered as arising from the same criminal episode, the offenses "must occur simultaneously or in close sequence and must occur in the same place or in closely situated places. A break in the action may be sufficient to interrupt the temporal proximity required for a single criminal episode to exist." *State v. Johnson*, 342 S.W.3d 468, 475 (Tenn. 2011) (citing 9 Tennessee Criminal Practice and Procedure § 17:17, at 601). For the mandatory joinder rule to apply to offenses arising from the same criminal episode, the proof of one offense must be inextricably connected with the proof of the other, or the proof of one offense must form a substantial portion of the proof of the other offense. *See id.*

Offenses joined under Rule 8(a) may be severed pursuant to Tenn. R. Crim. P. 14 if appropriate to promote a fair determination of the defendant's guilt or innocence. *See* Tenn. R. Crim. P. 14(b)(2)(A), (B). The trial court's refusal to grant a severance under

Tennessee Rule of Criminal Procedure 14(b)(2) will not be reversed unless the defendant was prejudiced by the decision to try the charges together. *State v. Wiseman*, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982).

Here, the Lutie Street offenses and the Hopewood Court offenses occurred in close sequence and in closely situated places. The suspects first went to Hopewood Court, where they sat in the gold car and cased Ms. Hobbs' residence. Because there were too many people out, the suspects drove around breaking into cars and ended up on Lutie Street around midnight. Lutie Street was in the same area of town and only about four miles away from Hopewood Court. The suspects broke into Mr. Corbett's and Mr. Weaver's vehicles on Lutie Street and shot at the victims as Ms. Paige Elliott drove away from the scene. By 2:00 a.m., the suspects then returned to Hopewood Court where they carried out their original plan of committing a home invasion robbery at Ms. Hobbs' residence. When Ms. Hobbs slammed the door on the Defendants, Defendant Rivas fired multiple shots at Ms. Hobbs, resulting in her death. There was no break in the action sufficient to negate mandatory joinder.

Moreover, the proof of the Hopewood Court offenses formed a substantial portion of the proof of the Lutie Street offenses because the proof of the Hopewood Court offenses was necessary to establish Defendant Rivas's identity as one of the shooters on Lutie Street. The victims of the Lutie Street shooting could not positively identify the suspects who shot at them; however, police collected .45 caliber shell casings from the scene of the Lutie Street shooting. They also collected .45 caliber shell casings from the shooting on Hopewood Court, and subsequent testing established that the shell casings were all fired from the same .45 caliber handgun. Defendant Rivas told Detective Baltimore that, although he was with the suspects that night, he did not fire a gun at either location. He claimed that Defendant Fryer had the .45 caliber handgun and that Defendant Fryer shot at the victims on Lutie Street and at Ms. Hobbs. However, Ms. Paige Elliott and Ms. Tanjanekia Elliott testified that it was Defendant Rivas who had the .45 caliber handgun and that he used it to shoot at the victims on Lutie Street; Ms. Paige Elliott testified further that Defendant Rivas used the same weapon to shoot at Ms. Hobbs. The accomplice testimony of Ms. Paige Elliott and Ms. Tanjanekia Elliott was corroborated by the video surveillance footage from Ms. Hobbs' residence that showed Defendant Rivas pointing a gun at Ms. Hobbs' residence as if he were shooting. The surveillance footage from Ms. Hobbs' residence further showed that the Defendants were wearing clothing that matched what they wore on the surveillance footage from Defendant Fryer's home when they were picked up on October 24 and dropped off on October 25. Under these circumstances, we conclude that the trial court properly determined that the Lutie Street offenses and the Hopewood Court offenses were subject to mandatory joinder under Tennessee Rule of Criminal Procedure 8(a). Additionally, we conclude that Defendant Rivas was not

prejudiced by the trial court's refusal to grant a severance under Tennessee Rule of Criminal Procedure 14(b)(2). Accordingly, he is not entitled to relief.

2. Permissive Joinder

The trial court also denied the Motion for Severance on the alternative ground that Defendant Rivas's offenses could be tried together based on permissive joinder, finding that the charges were part of a common scheme or plan and evidence from one crime would be admissible in a prosecution for the other crime to prove identity, intent, and motive.

Rule 8(b) of the Tennessee Rules of Criminal Procedure provides that "[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if: (1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). Tennessee courts recognize three types of common scheme or plan evidence: "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *State v. Shirley*, 6 S.W.3d 243, 248 (Tenn. 1999); *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999). A larger, continuing plan or conspiracy "involves not the similarity between the crimes, but [rather] the common goal or purpose at which they are directed." *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer v. State*, 12 S.W.3d 438, 447 n.12 (Tenn. 2000)). In other words, crimes that are part of a larger plan or conspiracy must be committed "in furtherance of a plan that had a readily distinguishable goal, not simply a string of similar offenses." *Id.* The Tennessee Supreme Court explained that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." *Moore*, 6 S.W.3d at 240 n.7.

Rule 14 provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1). Our supreme court has stated that, when reviewing the severance of offenses on appeal, the "primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of indictment had been severed." *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984). To protect a defendant's right to a fair trial, Tennessee Rule of Evidence 404(b) excludes "[e]vidence of other crimes, wrongs, or acts" committed by a defendant when the evidence is offered only to show the defendant's propensity to commit those "crimes, wrongs, or acts." Tenn. R. Evid. 404(b). However, evidence of other "crimes, wrongs, or acts" may be admissible for other purposes, such as motive, intent, guilty knowledge, identity of the defendant, absence of

- 25 -

mistake or accident, or a common scheme or plan for the commission of two or more crimes so related to each other that proof of one tends to establish the other. *Id.*, Adv. Comm'n Cmts.; *Hoyt*, 928 S.W.2d at 944.

Upon review, we agree with the trial court that, even if the two sets of offenses were not subject to mandatory joinder, Defendant Rivas's offenses could be tried together based on permissive joinder. The trial court found that the offenses were part of a larger, continuing plan or conspiracy. As previously noted, the Defendants armed themselves, discussed getting money, and set out to "hit licks" or targets on the night of the offenses. *See State v. Hall*, 976 S.W.2d 121, 146 (Tenn. 1998) (numerous burglaries and thefts and two murders were all part of a common scheme or plan by escaped inmates to avoid recapture). Moreover, the evidence of each set of offenses would have been admissible at the trial of the other. Although Defendant Rivas argues that there was no dispute as to identity, intent, or motive, we agree with the State that Defendant Rivas placed intent and motive at issue during opening statement when counsel for Defendant Rivas stated that, while Defendant Rivas was with the group, he just thought "they were going to get high and have sex with the girls." As previously explained, Defendant Rivas's identity as the shooter of the .45 caliber handgun was also an issue at trial. He denied shooting a gun on Lutie Street and claimed that it was Defendant Fryer who shot Ms. Hobbs at her Hopewood Court residence. Because evidence of one set of offenses would be admissible in the trial of the other set of offenses, we conclude that the trial court properly determined that a severance was not required under Tennessee Rule of Criminal Procedure 14(b)(1). Defendant Rivas is not entitled to relief on this claim.

### B. Motion to Suppress

Defendant Rivas contends that the trial court erred in denying the Motion to Suppress his statement to police. He argues that the waiver of his *Miranda* rights was invalid because he believed that he was not free to terminate the interview based on the "undue influence" of detectives conducting the interview. He further argues that the detectives failed to honor his request for an attorney during the interview. He asserts that "[t]he combination of a request for an attorney and the feeling that he was not free to end the interview" invalidated his waiver of his *Miranda* rights and that his statement was "tainted" due to this illegality. The State responds that the trial court properly denied Defendant Rivas's Motion to Suppress. We agree with the State.

On appeal from a trial court's ruling on a motion to suppress, the trial court's findings of fact should be upheld unless the evidence preponderates to the contrary. *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to

the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005) (citing *State v. Daniel*, 12 S.W. 2d 18, 23 (Tenn. 1996)).

### 1. Custodial Interrogation and Voluntary Miranda Waiver

Both the United States and Tennessee Constitutions protect against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In order to protect criminal defendants from self-incrimination, the United States Supreme Court has ruled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001). As part of those safeguards, police are required to inform persons who are subjected to custodial interrogation: (1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired. *See Miranda*, 384 U.S. at 444.

Our supreme court has stated that the test to determine whether a defendant was in custody is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). Our supreme court set out the following non-exclusive factors to assist in this determination:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* (internal citations omitted).

A defendant may waive his rights under *Miranda* if such waiver is voluntary, knowing, and intelligent. *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012). To determine whether a defendant waived his rights voluntarily, knowingly, and intelligently, courts must look at the totality of the circumstances. *Id.* Relevant factors include:

> the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the *Miranda* rights were explained.

*Id.* at 280-81.

In denying the Motion to Suppress, the trial court determined that Defendant Rivas was not in custody when he was questioned about his involvement in the offenses. The testimony from the hearing established that Detective Baltimore and a second detective knocked on the door of Defendant Rivas's mother's home during the daytime and asked to speak to Defendant Rivas, and Ms. Rivas-Montoya invited the detectives inside. The interview took place in the living room in the presence of Defendant Rivas's mother and sister. Defendant Rivas was not placed in handcuffs or otherwise prevented from leaving. Defendant Rivas's mother and sister monitored his discussion with the detectives, which lasted less than thirty minutes. As found by the trial court, the detectives' demeanor during the interview was calm, and they were responsive to Defendant Rivas's concerns about his safety. Detective Baltimore told Defendant Rivas that he could remain silent and that he did not have to speak to detectives. Finally, after the detectives left the home following the first interview, they came back minutes later, knocked on the door, and asked Defendant Rivas if they could ask him a few questions about the Lutie Street shooting, and Defendant Rivas complied without hesitation. On appeal, Defendant Rivas relies on the testimony of his mother and sister that they did not believe any of them were free to leave. However, the trial court, by its ruling, did not find their testimony credible. Under these circumstances, a reasonable person in Defendant Rivas's position would not have considered himself deprived of freedom of movement to a degree associated with a formal arrest. *Anderson*, 937 S.W.2d at 855.

Because this was not a custodial interrogation, the detectives were not required to advise Defendant Rivas of his *Miranda* rights before questioning him. Nevertheless, Detective Baltimore testified that he provided Defendant Rivas with a *Miranda* warning at the start of the interview because it was Detective Baltimore's practice to do so before questioning a suspect. So, even assuming that this was a custodial interrogation, the record demonstrates the use of effective procedural safeguards to "secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444.

- 28 -

Furthermore, even assuming Defendant Rivas was subject to custodial interrogation, we conclude that his waiver of *Miranda* was voluntary. The record establishes that Detective Baltimore read to Defendant Rivas all of the rights outlined in *Miranda*. Defendant Rivas was not under the influence of drugs or alcohol, and there was no proof that Defendant Rivas suffered from a mental disease or disorder. Moreover, the record reflects that Defendant Rivas had a G.E.D., that he had prior contact with the police through juvenile court, and that he was responsive to the detectives' questions. Defendant Rivas is not entitled to relief based on this claim.

## 2. Request for Counsel

Defendant Rivas contends that his statement should have been suppressed because he requested counsel during the interview and his request for counsel was not honored. He argues that he asked for an attorney and relies on the inaudible portions of the recording to support his argument. In *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the United States Supreme Court determined that, once a suspect asks for counsel, "additional safeguards" are required to protect the Fifth Amendment right against compelled self-incrimination and announced that:

> when [a suspect] has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A suspect], . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police.

*Id.* Then, in *Davis v. United States*, 512 U.S. 452 (1994), the United States Supreme Court stated that "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)); *see also State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," questioning need not cease, nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. *Davis*, 512 U.S. at 459, 461 (emphasis in original). "Whether an individual's request for counsel is equivocal or unequivocal is a mixed question of law and fact that is ultimately subject to de novo review." *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013).

In rejecting this claim, the trial court found that, after being read his *Miranda* rights, Defendant Rivas signed a waiver of rights form and agreed to speak to the detectives. The trial court found that there was nothing in the audio recording nor the transcript of the interview that indicated Defendant Rivas did not understand his *Miranda* rights. Although Defendant Rivas's mother mentioned an attorney, nowhere in the audio recording or the transcript did Defendant Rivas ask for counsel. Although there are a few words in the recording that are inaudible and so noted on the transcript, the trial court found that there was nothing inaudible on the recording "in or around the only time that there was any reference to an attorney." Moreover, the trial court did not accredit the testimony from Defendant Rivas's mother and sister that Defendant Rivas requested an attorney. The record does not preponderate against the factual findings by the trial court. It is clear from the record that Defendant Rivas was informed at the outset of the interview that he could request an attorney and that he was not under arrest. There are no portions of the audio recording from which it could be inferred that Defendant Rivas changed his mind about speaking to the detectives, and there is certainly no evidence that Defendant Rivas made an unequivocal request for counsel. *See Davis*, 512 U.S. at 459. Defendant is not entitled to relief based on this claim.

### 3. Voluntariness of Statement

Apart from our inquiry into Defendant Rivas's waiver of his *Miranda* rights, we must also determine whether his subsequent statement or confession was voluntarily given. *See Dickerson v. United States*, 530 U.S. 428, 432-33 (2000) (indicating that the test to determine the voluntariness of a statement is distinct from the determination concerning a defendant's waiver of his *Miranda* rights). In determining the voluntariness of a confession, the essential inquiry is whether a suspect's will was overborne so as to render the confession a product of coercion. *Id.*; *see also State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) ("The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment.").

In order to determine the voluntariness of Defendant Rivas's statement, we must consider the totality of the circumstances surrounding the statement, including "both the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434). The circumstances relevant to this determination are:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of

- 30 -

his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)).

In this case, although Defendant Rivas was nineteen years old, Ms. Rivas-Montoya testified that Defendant Rivas had several previous contacts with the police and had been taken to juvenile court before. The interview with Defendant Rivas lasted less than thirty minutes and occurred in Defendant Rivas's home with his mother and sister present. Defendant Rivas was not held in custody before questioning, and Detective Baltimore provided Defendant Rivas with a *Miranda* warning at the beginning of the interview. Moreover, both Defendant Rivas's mother and sister testified that he was not under the influence of drugs or alcohol at the time of the interview. Defendant Rivas's sister testified that Defendant Rivas was not physically abused or threatened with abuse during the interview. She said that the detectives did not take out their handcuffs or arrest anyone. Instead, as previously noted, the detectives' demeanor during the interview was calm, and they were responsive to Defendant Rivas's concerns about his safety. Under the totality of the circumstances, we conclude that Defendant Rivas's statement to police was voluntary and that his statement was not a product of coercion. *See Climer*, 400 S.W.3d at 568. Defendant is not entitled to relief.

## C. Sufficiency of the Evidence

Defendant Rivas and Defendant Fryer assert that the State failed to establish the element of premeditation necessary for their convictions for first degree premeditated murder in the death of Ms. Hobbs and for the attempted first degree murder of Mr. Corbett and Mr. Weaver. They argue that the State failed to demonstrate that they were "free from excitement and passion" at the time of the two shootings. Defendant Rivas and Defendant Fryer also contend that the evidence is insufficient to support their convictions for attempted aggravated burglary because the proof adduced at trial did not show that they intended, or attempted, to enter Ms. Hobbs's residence. They argue that they only intended to have someone come to the door of the residence so that they could rob the individual not so that they could burglarize the home. Finally, Defendant Rivas contends that the State produced insufficient evidence to support his conviction for employing a firearm during the commission of a dangerous felony in Count 4 because the "General Assembly arbitrarily determined that aggravated burglary was a dangerous felony." The State

responds that, when viewed in the light most favorable to the State, a reasonable jury could find that the State met its burden of proof. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2015). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2015). Premeditation "is an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (2015). "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id.* Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. *State v. Kiser*, 284 S.W.3d 227, 268

(Tenn. 2009). In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017).

Criminal attempt is defined as when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2015). Aggravated burglary is committed when a person enters a habitation, without effective consent of the owner, with the intent to commit a felony, theft, or assault. *See* Tenn. Code Ann. § 39-14-402(a)(1), -403(a) (2015).

In this case, the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2015). As pertinent here,

> [a] person is criminally responsible for an offense committed by the conduct of another, if[,] . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(2) (2015).

Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

- 33 -

## 1. First Degree Premeditated Murder and Attempted First Degree Murder

Viewed in the light most favorable to the State, the evidence is sufficient to support the Defendants' convictions for the attempted first degree murder of Mr. Corbett and Mr. Weaver. Defendant Rivas and Defendant Fryer got into Ms. Paige Elliott's car with loaded guns in their laps. Ms. Tanjanekia Elliott and Ms. Paige Elliott testified that Defendant Rivas had a black handgun and that Defendant Rivas had an AK-47. The testimony of multiple witnesses placed the Defendants in the back seat of Ms. Paige Elliott's car. After they were caught breaking into vehicles on Lutie Street, one of the Defendants rolled down the back seat window, and then the Defendants leaned out of the window and began shooting at Mr. Corbett, Mr. Weaver, and Ms. Blankenship. Mr. Corbett testified that he was standing in the driveway near Ms. Paige Elliott's car when they began shooting at him. He said that one bullet "went right past [his] skull." When Mr. Corbett and Mr. Weaver ran behind the box truck to take cover, the Defendants pointed their guns toward the box truck and fired multiple shots. A crime scene investigator testified that the box truck had two projectile strikes on it from bullets and that he found a "complete bullet" in the driver's door pocket and a bullet fragment under the box truck. Mr. Corbett and Mr. Weaver estimated that the Defendants fired fifteen shots at them, and they testified that they feared for their lives and believed they would be killed. Further, there was no evidence that the Defendants were acting out of "excitement and passion." When Mr. Corbett questioned Ms. Tanjanekia Elliott about what she was doing in his Trailblazer, she merely warned them that they should go back inside. Mr. Corbett, Mr. Weaver, and Ms. Blankenship then saw the back seat window roll down. They testified that they ran away from Ms. Paige Elliott's car, and then, the Defendants began shooting at them. As pointed out by the State, the Defendants could have simply driven away from the scene, rather than fire upon the victims. The Defendants had no need to fire multiple shots at the victims, unless they intended to shoot and kill them. Thus, any rational trier of fact could have found the essential elements of the crime of attempted first degree murder beyond a reasonable doubt.

The evidence is also sufficient to support the Defendants' convictions for first degree premeditated murder in the death of Ms. Hobbs when viewed in the light most favorable to the State. Again, the proof established that Defendant Rivas and Defendant Fryer armed themselves with deadly weapons, a .45 caliber handgun and an AK-47, and they did not hesitate before using the weapons to shoot at the victims on Lutie Street. From these facts, the jury could reasonably infer that the Defendants were prepared to shoot anyone who interfered with their criminal acts that night. Prior to the shooting on Lutie Street, Defendant Fryer repeatedly asked Ms. Paige Elliott "where the licks were[,]"and Ms. Tanjanekia Elliott testified that a "lick" was a "target" for a robbery. In response, Ms. Paige Elliott next drove the group to Hopewood Court, parked on the street for about ten minutes, and scoped out Ms. Hobbs' residence. Ms. Paige Elliott believed that her ex-boyfriend, Darry Hobbs, lived at the residence and that he and Ms. Hobbs sold drugs out

- 34 -

of the residence. When they returned to Hopewood Court after the shooting on Lutie Street, the Defendants and Ms. Paige Elliott sat in the car for a minute talking about what they were going to do. They then got out of the car and knocked on the front door of Ms. Hobbs' residence. Ms. Hobbs opened the door but then quickly closed it on the Defendants. Defendant Rivas, for whom Defendant Fryer was criminally responsible because he assisted in the crime, shot at Ms. Hobbs multiple times as she retreated into her residence. Ms. Hobbs sustained multiple gunshot wounds, including a "very significant wound" to her chest. Ms. Hobbs was unarmed, posed no threat to the Defendants, and in no way provoked the Defendants other than by closing the door on them. After the shooting, Defendant Rivas and Defendant Fryer fled the scene and did not render aid to the victim. Video surveillance footage showed that the Defendants took the weapons into Defendant Fryer's home after the shooting; however, Detective Baltimore testified that the weapons were not recovered when he executed a search warrant at the home. From this, the jury could reasonably infer that the Defendants secreted or destroyed the weapons used to commit the murder. Based on the foregoing, any rational trier of fact could have found the essential elements of the crime of first degree premeditated murder beyond a reasonable doubt.

### 2. Attempted Aggravated Burglary

Regarding their convictions for attempted aggravated burglary, the evidence presented at trial showed that, when Defendant Fryer asked "where the licks were[,]" Ms. Paige Elliott told the Defendants that they could "hit a lick" at Ms. Hobbs' residence because she believed that there were drugs and money inside the residence. Ms. Paige Elliott said that, the first time they went to Hopewood Court, they "roll[ed] by, check[ing] it out, just look[ing] around." Ms. Paige Elliott testified that, when they returned to Hopewood Court around 2:00 a.m., she backed up her car towards Ms. Hobbs' residence. She said that she and the Defendants were unsure if anyone was home but that their plan was "to go in there and get stuff." She stated that the group intended to rob "Ms. Hobbs['] house." The Defendants armed themselves with guns and approached the front door of the residence. Ms. Paige Elliott testified that she went to the side of the residence, and the Defendants knocked on the front door. Ms. Hobbs opened the front door and then quickly closed it on the Defendants. One of the Defendants then fired shots through the door, killing her. From this, a reasonable jury could find that the Defendants' intent was not to simply knock on the door of the residence at 2:00 a.m. and rob whoever answered the door without entering the home. At that time of the morning, it would have been unlikely that whoever answered the door would have a large amount of money and drugs on their person, such that the Defendants would have no need to enter the residence. Rather, a reasonable jury could infer that the armed Defendants intended to force their way into the residence to accomplish the intended robbery. When viewed in the light most favorable to the State,

the evidence was sufficient to support the Defendants' convictions for attempted aggravated burglary.

### 3. Employing a Firearm During the Commission of a Dangerous Felony

Defendant Rivas also argues that the State produced insufficient evidence to support his conviction for employing a firearm during the commission of a dangerous felony in Count 4 because the "General Assembly arbitrarily determined that aggravated burglary was a dangerous felony." He argues that the offense of aggravated burglary "does not, by definition, involve dangerous behavior and cannot be deemed a dangerous felony by the General Assembly without some causal connection between the offense conduct and the enhancement." As noted by the State, however, a plain reading of the statute indicates that the General Assembly fully intended to include aggravated burglary as a dangerous felony. *See* Tenn. Code Ann. § 39-17-1324(b)(1), (i)(1)(H) (2015). The Legislature holds the power to define criminal offenses and assess punishments for crimes, *State v. Cabe*, 579 S.W.3d 343, 349-50 (Tenn. Crim. App. 2018) (citing *State v. Burdin*, 924 S.W.2d 82, 87 (Tenn. 1996)), and "it is not for the courts to alter or amend a statute, question the statute's reasonableness, or 'substitut[e] [our] own policy judgments for those of the legislature.'" *State v. Owens*, 20 S.W.3d 634, 640 (Tenn. 2000) (quoting *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)). Defendant Rivas is not entitled to relief based on this issue.

### *D. Sentencing*

Defendant Rivas asserts that the trial court abused its discretion by imposing consecutive sentences. He argues that the total effective sentence of life plus fifty-two years was not the "least sever measure necessary" and was not "justly deserved in relation to the seriousness of the offense[s]" that he committed. He asserts that the trial court's decision to impose consecutive sentences demonstrated "a lack of logic or proper reasoning" because, while the trial court "base[d] its decision on the purported need for both general deterrence and the specific deterrence," Defendant Rivas would be incarcerated on the life sentence until 2067, at which time he would be seventy. He contends that the additional consecutive time to serve adds nothing to the specific or general deterrence "considering the extreme sentence of [l]ife and its accompanying deterrence." The State responds that the trial court properly imposed consecutive sentences. We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682,

707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2018); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2018).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2018); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2018), Sentencing Comm'n Cmts.

The Tennessee Supreme Court has held that the *Bise* standard applies to consecutive sentencing determinations "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds" for discretionary consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). A trial court "may order sentences to run consecutively" if it finds that the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4) (2018); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. In order to limit the use of the "dangerous offender" category to cases where it is warranted, our supreme court has stated that the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). "The mere recitation of the *Wilkerson* factors is not a substitute for the requirement of making specific findings." *State v. Prentice C. Calloway*, No. M2004-

- 37 -

01118-CCA-R3-CD, 2005 WL 1307800, at *13 (Tenn. Crim. App. June 2, 2005), *no perm. app. filed.*

In sentencing Defendant Rivas, the trial court noted that, it considered:

(1) the evidence received at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report; and (8) the potential for rehabilitation or treatment.

Regarding the issue of sentence alignment, the trial court explained that, as a matter of law, a sentence for employing a firearm during the commission of a dangerous felony "must be run consecutively to the underlying offenses. Thus, Count 4 must run consecutive to Count 3, and Count 9 must run consecutive to Count 5." *See* Tenn. Code Ann. § 39-17-1324(e)(1) (2019).

In reviewing the discretionary consecutive sentencing factors, the trial court found that by a preponderance of the evidence that Defendant Rivas was "a, dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," citing Tennessee Code Annotated section 40-35-115(b)(4) (2019). The trial court stated:

The Court is clearly deeply troubled by [Defendant Rivas's] role in the murder of Ms. Hobbs, particularly since the proof at trial indicated that he was the shooter. While that incident alone tends to show [Defendant Rivas] has little or no regard for human life, that was not [Defendant Rivas's] only behavior on the night of the murder that would support such a finding. Instead, earlier in the evening, after Ms. Tanjanekia Elliott was confronted as she was breaking into a car on Lutie Street, [Defendant Rivas], along with [Defendant] Fryer, opened fire on Mr. Corbett and Mr. Weaver, leading to his two convictions for attempted first degree premeditated murder. Additionally, [Defendant Rivas's] actions placed Ms. Blankenship in danger, as she could have easily been injured or killed by the gunshots. The Court notes that opening fire during the course of any criminal offense is clearly dangerous and unacceptable. However, the Court finds this behavior to be a particularly outrageous response in this situation, as Ms. Tanjanekia Elliott

- 38 -

was "only" breaking into a car at the time. In finding [Defendant Rivas] to be a dangerous offender, the Court must also make several other findings regarding the application of this factor. *See State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). First, the Court also finds that consecutive sentencing reasonably relates to the severity of the offenses. *See id.* Absent consecutive sentencing, [Defendant Rivas's] sentences for his convictions for the attempted murders of Mr. Corbett and Mr. Weaver would effectively be moot, as they would be subsumed in his sentence for the murder of Ms. Hobbs. Second, the Court finds that consecutive sentencing is "necessary to protect the public against further criminal conduct by the defendant[.]" As the Court discussed in finding [Defendant Rivas] to be a dangerous offender, the Court is deeply concerned by the senselessness of [Defendant Rivas's] violent behavior in these incidents. Given [Defendant Rivas's] apparent disregard for the value of human life, the Court is of the opinion that consecutive sentencing is necessary to protect the public from further criminal conduct by [Defendant Rivas]. Finally, the Court finds that consecutive sentencing is consistent with the "general principles of sentencing." *Id.* While the Court hopes that the Defendant is rehabilitated during his time serving this sentence, the Court also finds that consecutive sentencing is appropriate to provide an effective deterrent. *See* Tenn. Code Ann. § 40-35-102(3)(A). The Court is concerned that concurrent sentencing would provide no deterrent effect, as [Defendant Rivas] would experience no increased punishment for his other criminal behavior outside of the murder of Ms. Hobbs. This could create a perverse incentive that if a potential defendant were to commit a particularly serious offense, they might as well commit other lesser offenses because there would be no increased punishment if they were later arrested for that behavior. Further, the Court is of the opinion that ordering [Defendant Rivas's] sentences for his convictions for employing a firearm during the commission of an offense to be run consecutively is consistent with the general purposes of sentencing as well. While those sentences are only statutorily mandated to run consecutive to the underlying offenses, the Court is of the opinion that ordering them to be served consecutively gives effect to the legislature's purpose in deterring the possession and use of firearms during the commission of certain offenses. Thus, the Court finds that consecutive sentencing is consistent with the general purposes of sentencing.

Here, the trial court properly articulated its reasons for ordering consecutive sentences based on its finding that Defendant Rivas was a dangerous offender and its consideration of the *Wilkerson* factors; thus, the sentences are presumed reasonable absent an abuse of discretion. *Pollard*, 432 S.W.3d at 860. The record supports the trial court's

- 39 -

conclusion that Defendant Rivas was a dangerous offender whose behavior indicated little or no regard for human life, and no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4) (2019). Defendant Rivas fired multiple shots at Ms. Hobbs and into her home in the middle of the night, killing Ms. Hobbs and potentially putting Ms. Hobbs' two young children, who were inside the home, at risk of death. Moreover, only two hours before killing Ms. Hobbs, Defendant Rivas was involved in the shooting on Lutie Street, which had the potential to kill numerous other people. As noted by the State, this court has upheld lengthy sentences that place a defendant's release eligibility far past the age of ordinary longevity. *See State v. Anthony Wilson and Deangelo Taylor*, No. W2014-01054-CCA-R3-CD, 2015 WL 8555599, at *27 (Tenn. Crim. App. Dec. 11, 2015) (collecting cases and holding that, "[t]here is no support in statutory or case law for this proposition. Rather, this court has upheld lengthy sentences that place defendants' release eligibility far past the age of ordinary longevity"), *perm. app. denied* (Tenn. Mar. 23, 2016). Defendant Rivas is not entitled to relief on this claim.

### III. Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE